_____

PAUL A. OSBORNE,

                              Petitioner,

                                                    DECISION AND ORDER

-vs-

                                                    15-CV-6042 CJS

HAROLD GRAHAM,

                              Respondent.

_____


APPEARANCES

For Petitioner:          Paul A. Osborne,  *pro se*
                         09-B-1753
                         Attica Correctional Facility
                         P.O. Box 149
                         Attica, New York 14011

For Respondent:          Dennis A. Rambaud
                         Office of the New York State Attorney General
                         120 Broadway
                         New York, New York 100271


INTRODUCTION

Now before the Court is Paul A. Osborne's ("Defendant" or "Osborne") habeas corpus application pursuant to 28 U.S.C. § 2254. The application is denied.

BACKGROUND

This action arises from a robbery and murder that took place on August 23, 2007, in Niagara Falls, New York. Evidence at trial indicated that on that date, Donald Paige, Jr. ("Donny"), who sold marijuana, had several telephone conversations with a male acquaintance named Cortney Dennis ("Cortney"), to whom he had apparently sold

marijuana previously. Cortney's mother was residing at a house that was several hundred feet down the street from Donny's house, from which Donny's house was visible, though it is unclear whether Donny knew that Cortney had a relative living nearby. Cortney's mother had an automobile that she had loaned to Cortney's brother, Brandon Dennis ("Brandon"). Earlier that day, an undercover Buffalo police officer observed, and spoke with, Brandon and Petitioner Osborne, who were together in Buffalo, and who then drove away in Brandon's mother's car. The undercover officer observed that Brandon, who is missing a front tooth, was wearing a brown hoodie sweatshirt, and that Petitioner was wearing a black hoodie and a San Diego Padres baseball cap. Telephone records indicate that there were calls between Cortney's phone and a phone belonging to Brandon's girlfriend (which phone Brandon was apparently using) that day, and that there were calls between the girlfriend's phone and Osborne's phone before the two had met up that day.

At approximately 10 pm that evening, Donny and his friend, Victor Bullard ("Bullard") drove to Donny's house, whereupon Donny parked his SUV, which he had taken through a car wash just minutes earlier, in the driveway. Donny went inside the house, while Bullard remained in the passenger seat of Donny's SUV. As Bullard sat there, a male in a black hoodie snuck up alongside the SUV, opened his door, pointed a gun at him, and told him that the gun was a "MAC 10" and that he should not try anything. A second male wearing a brown hoodie, and missing a front tooth, then got into the driver's-side back seat of Donny's SUV, while the man in the black hoodie got into the passenger-side rear seat, behind Bullard. The man in the brown hoodie, who also had a pistol, told Bullard that they were there to rob Donny, and he also robbed Bullard of the contents of his pockets. The man in the black hoodie then expressed the desire to shoot Bullard, whereupon the man

2

in the brown hoodie said no, because the shots might be heard inside the house. The man in the black hoodie then struck Bullard in the head with his gun, causing a laceration to Bullard's scalp.

A few minutes later, Donny came out of the house and walked toward his SUV, but apparently did not see the men in the back seat. Bullard jumped out of the vehicle and ran, and the two men exited the SUV and began fighting with Donny. Donny's father ("Mr. Paige") and sister  Dichiara Paige ("Dichiara"), who were inside the house, heard the fighting and came outside, and saw the two men punching Donny. Mr. Paige pulled the man in the black hoodie away from Donny, and  was bitten on the finger and arm as he did so. Dichiara pushed the man in the brown hoodie away from Donny, and stood between the two men. The man in the brown hoodie then drew a pistol, and threatened to shoot Mr. Paige if he moved. Donny moved forward and the man in the brown hoodie fired three shots, two of which struck Donny in the head and neck, respectively, killing him. The third shot struck Dichiara in the forearm. The man in the brown hoodie then ran away. The man in the black hoodie also ran away at some undetermined point between when Mr. Paige and Dichiara intervened in the fracas and when the shots were fired.

Using fingerprints found on Donny's otherwise spotless SUV, police zeroed in on Petitioner as a suspect. Then, with additional information from the undercover police officer, discussed earlier, police identified Brandon as a second suspect. Using photo arrays prepared by the police, Bullard identified Petitioner as the man in the black hoodie, and Brandon as the man in the brown hoodie. Dichiara also identified Brandon, from a photo array, as the man in the brown hoodie, and as the man who shot Donny. During questioning by the police, Petitioner agreed to provide a DNA sample, and his DNA was

then matched to DNA found on both Mr. Paige's bitten finger and on a San Diego Padre's ball cap that had been found in the Paige's driveway.

The prosecution's theory was that Cortney Dennis had set up the robbery, and that Petitioner and Brandon had waited at Brandon's mother's house, within view of the Paige's home, until Donny arrived home, and then proceeded to ambush him and Bullard. Petitioner and Brandon were tried together, on charges including felony murder and robbery. Faced with fingerprint evidence, DNA evidence and eyewitness testimony placing him at the scene, Petitioner's trial defense theory was primarily that Bullard's testimony was not credible, which, he argued, negated any evidence of a robbery or an intention to commit robbery, and any evidence that Petitioner had possessed a firearm. Petitioner's counsel argued that without Bullard's testimony, there was only evidence of a scuffle between Donny, Petitioner and Brandon, after which Petitioner had run away before Brandon shot either Donny or Dichiara. Brandon's defense theory also was that Bullard's testimony was not credible, that there was no physical evidence linking him to the crime scene, and that the witnesses had mis-identified him as the man in the brown hoodie, most likely because their attention would have been focused upon the gun in the hand of the man wearing the brown hoodie. However, the jury convicted Petitioner and Brandon, and both are now serving sentences in the custody of the New York State Department of Corrections and Community Supervision. Petitioner, who filed an unsuccessful appeal and several collateral attacks in state court, now brings the subject habeas petition.

Additional pertinent underlying facts were accurately summarized in Respondent's Memorandum in Opposition (Docket No. [#9]), as follows:

On September 4, 2007, Bullard viewed a six-photo array[.]  At the time, it was Bullard's understanding that one of the photographs depicted a suspect that the police had developed.  Bullard identified petitioner as one of the robbers.

On September 6, 2007, the police arrested Petitioner.  Det. Frank Coney advised him of his *Miranda* warnings, and he agreed to speak with the police. No promises or threats were made to him and he never requested an attorney, or asked police to end the interview.  [Shortly before the murder and robbery, Petitioner had been charged in an unrelated drug crime, and was represented by an attorney in that proceeding.  However, Petitioner did not ask to speak to that attorney.]

In response to questioning, Petitioner stated that he did not know where he [had been] on August 23 and 24, 2007, and he had no idea how his fingerprints came to be on the side of Donny's truck.  Petitioner denied being at Donny's house the night that he was killed[, though he admitted that] he knew Donny because he [had] bought "weed" from him in the past.

***

Police took Petitioner's buccal swabs, which forensic serologist Keith Meyers later analyzed, along with other evidence obtained in connection with the investigation.  Mr. Paige's bitten finger contained a mixture of DNA from two individuals, with Mr. Paige being the major contributor and Petitioner being the minor contributor. The probability of selecting an unrelated individual whose DNA profile matched Petitioner's was "one in one point thirty-four billion." (Myers: 1177-79.) The inner band of [the San Diego Padres] baseball cap found at the scene contained a mixture of DNA from three people, with Petitioner being the major contributor.  The likelihood of finding another person with the same DNA on the cap as Petitioner was "one in thirty-eight point eight quadrillion."

In the course of the investigation, State Police Investigator Michael P. O'Rourke spoke to Lt. Thomson regarding a conversation that he had with Petitioner and a second individual outside a Buffalo restaurant on August 23, 2007 at 1:38 p.m.  After that encounter, Petitioner and the second person drove away in a car bearing license plate DZK1784.  That car was registered to a Reginald Walker at 2103 North Avenue in Niagara Falls[, which is the aforementioned house that is visible from Donny Paige's house.]  At that

location, Thomson spoke to a resident, Carol Groomes. Groomes told Thomson that her son, codefendant Brandon Dennis, had the car in question. O'Rourke later had an opportunity to see a photograph of [Brandon] Dennis, and recognized him as the person he saw Petitioner with on August 23, 2007.

On September 25, 2007, the police separately showed a photo array to Bullard and Dichiara, and they each identified Brandon Dennis as the second assailant.

\*\*\*

The jury found Petitioner guilty of three counts of first-degree robbery, attempted first-degree robbery, first-degree criminal use of a firearm, second-degree criminal use of a weapon, two counts of second-degree assault, and three counts of second-degree murder.

\*\*\*

The court sentenced Petitioner to three indeterminate prison terms of 25 years to life for second-degree murder, determinate prison terms of 15 years for attempted first-degree robbery and second-degree criminal use of a firearm, and two determinate prison terms of 7 years for second-degree assault, and three determinate prison terms of 25 years for first-degree robbery. The court imposed a period of 5 years post-release supervision for the attempted first-degree robbery, second-degree criminal use of a firearm, and first-degree robbery counts, and three years of post-release supervision for second-degree assault counts. The court directed that all counts run concurrently with each other, but that the robbery counts run consecutively the second-degree murder counts.

\*\*\*

Petitioner argued, in a *pro se* C.P.L. § 440.10 motion dated November 5, 2010, that his trial counsel was ineffective because he did not: (1) move to dismiss the indictment [on the ground that] Petitioner [had been] denied his right to testify in the grand jury; [or] (2) properly move to suppress statements. Construed liberally, in the motion, Petitioner stated that he met with counsel when was produced to testify in the grand jury, but he was precluded from testifying when he refused to sign a "document." Although Petitioner claimed the document "implicat[ed] Brandon Dennis", Petitioner appeared to be referring to a waiver of immunity. The People filed opposition papers, and Petitioner filed a reply. By Decision and Order, dated June 28, 2011, the 440 court (Sperrazza, J.) denied the motion. (SR-41-45.) It found

that petitioner's statement regarding his refusal to sign the "document," pertained to the waiver of immunity that is customarily reviewed by a defendant and his counsel before testifying in the grand jury. The court found further that Petitioner, with the assistance of counsel, declined to sign the waiver and, and thus to testify, and that he failed to demonstrate that the result of the grand jury proceeding would have been different had he testified. Next, the court found Petitioner's claim that counsel [had failed to] properly move to suppress statements and . . . to preclude a "tainted identification," was belied by the record.

On September 9, 2011, the Appellate Division, Fourth Department, denied Petitioner's motion for leave to appeal.

[In his direct appeal,] Petitioner filed a counseled brief and appendix in the Appellate Division, Fourth Department. (SR-49-197.) Petitioner contended that: (1) his joint trial with [Brandon] Dennis was unfair; (2) his trial counsel was ineffective because he did not: (a) request a *Ventimiglia* hearing and object to the introduction of testimony of prior bad acts; (b) move for a trial order of dismissal with respect to the second-degree assault and second-degree murder counts charged under counts nine and 11 and 12; (c) object to the People's misstatement of evidence in summation; and (d) impeach the identification procedure with respect to Bullard; (3) the evidence was legally insufficient to establish his guilt with respect to the second-degree assault and second-degree murder counts charged in counts nine, 11 and 12; (4) the verdict was against the weight of the evidence; (5) the sentence was harsh and excessive; (6) the court improperly granted the People's request to rebut the defense argument characterized by the People as the affirmative defense of renunciation; (7) the court improperly granted the People's *Ventimiglia* motion; and (8) the hearing court erred when it denied suppression of the DNA evidence and Bullard's identification.

Petitioner [also] filed a *pro se* supplemental brief and appendix contending that: (1) he was denied his right to testify in the grand jury; (2) the legal instructions in the grand jury were incorrect and misleading; (3) the court failed to disclose and place on the record a jury note that requested an opportunity to see original photo arrays introduced into evidence; (4) trial counsel was ineffective because he: (a) did not request a trial order of dismissal concerning all counts: (b) shifted the burden of proof during the

defense summation; (c) did not object to the multiplicity of the indictment; (d) did not object to testimony that bolstered Bullard's identification of petitioner, [or to] the prosecutor's summation comments concerning Bullard's identification; (e) did not use Det. Coney's grand jury testimony for his impeachment at trial; (f) did not renew petitioner's severance motion; and (g) did not object to two grossly unqualified jurors; (5) he was deprived of his right to counsel at the time of his arrest; and (6) the consecutive sentences imposed were not authorized by law.

The People filed separate briefs responding to the counseled and *pro se* supplemental briefs. And petitioner filed both counseled and *pro se* supplemental reply briefs.

The Appellate Division unanimously modified petitioner's judgment by directing that the sentences imposed for the three counts of first-degree robbery (counts 1 to 3) run concurrently with the sentence imposed for felony murder, under count 12, and as modified affirmed the judgment. *Osborne*, 88 A.D.3d at 1284. The court found that the sentence, as modified, was legal and not unduly harsh and severe. *Id*.

The Appellate Division found that "[t]he evidence before the [suppression] court established that [petitioner] voluntarily agreed to provide a saliva sample for DNA testing" and therefore the court did not err when it denied petitioner's motion to suppress that evidence. *Id*. at 1285.

The Appellate Division further found that the suppression court did not err when it denied suppression of evidence of Bullard's identification because the People established "the reasonableness of the police conduct and the lack of any undue suggestiveness" and petitioner "did not meet his [ ] ultimate burden of proving that the procedure was unduly suggestive." *Id*. (citation omitted).

The Appellate Division rejected petitioner's *pro se* contention that he was denied his right to counsel when the police questioned him because he "did not have a derivative right to counsel arising from that prior representation for which he was not in custody." *Id*. at 1286.

Next, the Appellate Division found that petitioner failed to preserve for the court's review his contention that the court should have granted his motion to sever the trial from codefendant Dennis because there was DNA and fingerprint evidence that implicated petitioner but not Dennis. *Id*. As an alternative ground, the Appellate Division found that petitioner's severance claim was "without merit" because: the fact that Dennis's attorney stressed the weakness of the case against Dennis "did not present an irreconcilable conflict warranting severance"; (2) Dennis's "attorney did not act as a second prosecutor" and "simply argued to the jury that there was no DNA or fingerprint evidence implicating his client"; and (3) Dennis's attorney "did not take an aggressive adversarial stance against [petitioner] or elicit damaging evidence that had not been brought out by the People." Id. at 1285 (citations omitted).

The Appellate Division also found unpreserved petitioner's contention in his main brief that the evidence was legally insufficient to prove his conviction for second-degree assault and two second-degree murder counts. *Id.* And, the court found that the verdict was not against the weight of the evidence. *Id*. at 1285-86.

The Appellate Division rejected petitioner's claim in his main and *pro se* supplemental brief that his trial counsel was ineffective based on the failure of counsel to challenge the legal sufficiency of the evidence on specific grounds and to make certain objections. The court found that viewing counsel's representation as a whole, petitioner received effective assistance of counsel. *Id*. at 1286.

The Appellate Division found further that petitioner "waived his contention in his *pro se* supplemental brief that he was denied his right to testify before the grand jury, inasmuch as he failed to move to dismiss the indictment on that ground within the requisite five-day statutory period." Id.

The Appellate Division considered the remaining contentions of petitioner raised in his main and his *pro se* supplemental briefs and concluded that they were without merit. *Id*. at 1287.

Petitioner filed a *pro se* application for leave to appeal, which the People opposed. Petitioner filed a counseled leave application. By Order dated, August 13, 2012, the Court of Appeals denied leave to appeal. *Osborne*, 19 N.Y.3d at 999.

Petitioner filed a *pro se* motion for reconsideration, which the Court of Appeals denied . . . on October 31, 2012. *Osborne*, 19 N.Y.3d at 1104.

Petitioner filed a motion for a writ of error coram nobis in the Appellate Division, Fourth Department, dated October 22, 2013. Petitioner contended that his appellate counsel was ineffective because: (1) her arguments were not fully developed and supported by authority; (2) she did not argue that the evidence was legally insufficient to establish that petitioner was guilty of second degree criminal possession of a weapon; and (3) she did not argue that trial counsel was ineffective for not: (a) objecting when the court permitted the People to rebut the defense argument characterized by the prosecution as renunciation; (b) objecting to prosecutorial misconduct in summation; and (c) requesting that "immediate flight with all the elements be charged in regards to felony murder." The People filed opposition papers and petitioner filed a reply.

By Order dated December 27, 2013, the Appellate Division denied petitioner's coram nobis motion, and on April 28, 2014, the Court of Appeals denied petitioner's application for leave to appeal. On June 25, 2014, the Court of Appeals denied petitioner's motion for reconsideration.

Petitioner moved to set aside the sentence under C.P.L. § 440.20, dated May 1, 2014. Petitioner contended, in relevant part, that the determinate sentences with periods of post-release supervision imposed exceeded the maximum terms allowed by statute. The People filed opposition papers.

On August 26, 2014, the County Court (Farkas, J.), denied that motion. The court found that "[a] period of post-release supervision is a component part of every determinate term of imprisonment" and that the court "sentenced the [petitioner] with the mandated periods of post-release supervision in accordance with law."

Petitioner sought leave to appeal. The People opposed that application and petitioner filed a reply. By order dated January 6, 2015, the Appellate Division, Fourth Department, denied petitioner leave to appeal.

[On January 23, 2015, Petitioner commenced this habeas corpus action, proceeding *pro se*. In his petition,] Petitioner appear[ed] to assert the following claims, renumbered here: (1) his trial counsel was ineffective because he did not: (a) move to dismiss the indictment when petitioner was denied his right to testify in the grand jury; (b) move to suppress all evidence due to the denial of petitioner's right to counsel at the time of his arrest; (c) request a *Ventimiglia* hearing and object to the introduction of testimony of prior bad acts on the People's case; (d) preserve a legal sufficiency claim by moving for a trial order of dismissal on all counts; (e) object to the People's alleged misstatement of evidence in their summation; (f) argue that the identification procedure was defective; (g) object to bolstering testimony and any reference to that testimony in summation; (h) utilize Det. Frank Coney's grand jury testimony for impeachment at trial; (i) renew petitioner's motion for a severance; and (j) object to two allegedly "grossly unqualified" jurors (Pet. Ground One); (2) his appellate counsel was ineffective because she did not: (a) present her legal arguments that were fully developed and supported by authority; (b) assert that trial counsel was ineffective because he failed to: (i) object when the court permitted the prosecutor to rebut a defense summation argument characterized by the People as a renunciation defense; (ii) object to prosecutorial misconduct in summation; and (iii) request a particular jury instruction on the felony murder count (Pet. Ground Two); and (c) raise a legal sufficiency claim with respect to the second-degree criminal possession of a weapon count (Pet. Ground Two); (3) the People gave misleading and incomplete legal instructions to the grand jury (Pet. Ground Three); (4) the trial court failed to notify the parties concerning a jury note (Pet. Ground Four); (5) his statements were obtained in violation of his right to counsel (Pet. Ground Five); (6) the trial court improperly granted the People's request to rebut the defense argument characterized by the People as a renunciation defense (Pet. Ground Six); (7) the court erroneously denied suppression of the DNA evidence (Pet. Ground Seven); (8) the court erroneously denied the suppression of Victor Bullard's identification testimony (Pet. Ground Seven); and (9) the sentence imposed was illegal and in violation of double jeopardy (Pet. Ground Eight).

Respondent's Memo of Law [#9] at pp. 12-26 (citations omitted).   Respondent opposed

the application.

On July 24, 2015, Petitioner filed a motion [#11] for stay and abeyance.  On August

31, 2015, the Court denied that request. (Order [#15]).  In response, on September 25,

2015, Petitioner withdrew the claims that he deemed unexhausted. (Docket No. [#16]).  In

particular, Petitioner withdrew the following claims: that trial counsel was ineffective for

allegedly failing to request a *Ventimiglia* hearing[1] and for failing to object to testimony

concerning bad acts (referring to testimony by undercover officer O'Rourke); that trial

counsel was ineffective for failing to object to the Prosecution's summation; that trial

counsel was ineffective for failing to challenge, during his summation, Bullard's

identification; that the trial court erred by allowing the prosecution to argue that Petitioner

had not demonstrated a renunciation defense; that Petitioner's Fourth Amendment rights

were violated by the taking of his DNA buccal swab; and, that the trial court erred by

denying Petitioner's motion to suppress identification evidence.  On October 2, 2015, the

Court issued an Order [#17], noting that Petitioner had voluntarily withdrawn the

aforementioned claims.

On October 26, 2015, Petitioner filed his reply/traverse [#18].

On March 10, 2016, Petitioner filed a motion to amend [#20] the petition, to add

newly-exhausted claims.  Petitioner's application indicated that the newly-exhausted claims

were not the same claims that he previously withdrew.  The proposed new claims relate

to ineffective assistance of appellate counsel, and are, specifically, as follows:

---

[1]A hearing to determine the admissibility at trial, in the Prosecution's direct case, of evidence of a criminal defendant's prior uncharged criminal conduct or bad acts, referring to *People v. Ventimiglia*, 52 N.Y.2d 350, 359, 438 N.Y.S.2d 261, 420 N.E.2d 59 (1981).

Appellate Counsel was ineffective for failing to brief on appeal that trial court's suppression ruling was erroneous for granting a *Huntley/Wade* hearing but ruling on *Mapp* and probable cause issues without granting a hearing on them which shifted the burden of proof, for failing to raise stand-in-counsel's ineffectiveness for representing petitioner at a suppression hearing without becoming familiar with the case and failing to object to trial court's erroneous suppression ruling granting a *Huntley/Wade* hearing but ruling on *Mapp* and probable cause issues without granting a hearing on them which shifted the burden of proof, and for failing to raise the issue that petitioner was deprived of his constitutional right to be tried and convicted only on those crimes and theories charged in the indictment.

Motion to Amend [#20] at ¶ 24. On November 2, 2016, Respondent filed a response [#25] to the motion to amend. Respondent maintains that the motion should be denied for two reasons: First, because Petitioner did not provide a proposed amended petition along with the application, and therefore failed to comply with the local rules; and second, because the proposed new claims do not relate back to the filing of the original petition and are therefore untimely. With regard to timeliness, Respondent indicates that Petitioner's conviction became final on January 29, 2013, and that (factoring in tolling, while various state-court applications were pending), Petitioner's one-year statute of limitations for filing a habeas petition expired on April 15, 2015. Further, Respondent indicates that the proposed new claims do not "relate back," because they assert grounds of ineffective assistance that are different than those that were raised in the original Petition [#1]. On November 28, 2016, Petitioner filed a reply [#27], in which he asks the Court to excuse his failure to include a proposed amended petition, and maintains that the proposed amended claims relate back to the original petition.[2] In particular, Petitioner alleges that the

---

[2]Petitioner also contends that the Respondent's opposition to his motion to amend should be disregarded as untimely, but this argument clearly lacks merit, since the Court already issue a ruling [#26], deeming Respondent's opposition timely filed.

proposed amended claims relate back to the facts alleged in points I(2), I(9), II(2), II(3), II(5) and V of the original Petition [#1].

On May 1, 2017, Petitioner filed a motion [#29] to expand the record to include documents concerning the state court action, the bulk of which are already part of the record. The documents relate mainly to suppression issues. Respondent did not respond to this application.

DISCUSSION

Petitioner's *Pro Se* Status

Since Petitioner is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Section 2254 Principles

Petitioner brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, and the general legal principles applicable to such a claim are well settled:

> [A] federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).
>
> A state court decision is contrary to clearly established Federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's result.

A state court decision involves an unreasonable application of clearly established Federal law when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case. To meet that standard, the state court's decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. It is well established in this circuit that the objectively unreasonable standard of § 2254(d)(1) means that a petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.

*Santana v. Capra*, No. 15-CV-1818 (JGK), 2018 WL 369773, at *7–8 (S.D.N.Y. Jan. 11, 2018) (Koeltl, J.) (citations and internal quotation marks omitted).

"On habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The applicant bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id*. "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 120 (2d Cir. 2015) (internal quotation marks omitted).

<u>Petitioner's Application to Expand the Record is Denied</u>

Petitioner's application to expand the record [#29] is denied. " In reviewing a state court's decision on the merits under § 2254(d), federal courts are generally not permitted to expand the record beyond what was before the state court." *Kelley v. Larkin*, 680 F. App'x 5, 7 (2d Cir. Feb. 21, 2017) (*citing Cullen v. Pinholster*, 563 U.S. 170, 181-85, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)), cert. denied, 138 S. Ct. 396, 199 L. Ed. 2d 293 (2017). As already noted, much of the documentation that Petitioner seeks to "add" to the record is already part of the state court record before the Court. As for any additional

documents, Petitioner has not demonstrated that such documents were before the state courts. Rather, it appears that Petitioner is attempting to rely on documentation that was not before the state courts, such as police reports, to make new arguments concerning suppression issues. For example, Petitioner seems to be now arguing that police officers planted his fingerprints on Donny Paige's SUV,[3] though that is not what the new documentation shows. In any event, since Petitioner has not shown that the new documents he seeks to add to the record were before the state courts, his application is denied. Nor does the application otherwise entitle Petitioner to an evidentiary hearing.

<u>Petitioner's Application to Amend the Petition is Denied</u>

After factoring in all tolling related to Petitioner's state court applications, he nevertheless made the subject motion to amend more than one year after his conviction became final. Accordingly, and as Petitioner seems to acknowledge, the claims that he seeks to add to the petition are time barred unless they "relate back" to the claims in the original petition.

In this regard, "a habeas petitioner, like any civil litigant, is entitled to amend his petition, *see* 28 U.S.C. § 2242, and an amendment will 'relate back' to the date of his original petition if the added claim 'arose out of the conduct, transaction, or occurrence set forth' originally." *Zarvela v. Artuz*, 254 F.3d 374, 382 (2d Cir. 2001), as amended (June 26, 2001), as amended (Aug. 17, 2001). More specifically, "an amended claim relates back when it arises "from the same core facts alleged in the original petition, not those related generally to petitioner's trial, conviction, or sentence." *Gibson v. Artus*, 407 F. App'x. 517,

---

[3]See, e.g., Docket No. [#29] at p. 34.

16

519, 2010 WL 4342198 at * 2 (2d Cir. Nov. 3, 2010).[4]

For example, where a petitioner is attempting to amend his petition to assert new claims of ineffective assistance of counsel, the proposed new claims do not necessarily relate back to other claims of ineffective assistance of counsel that were included in the original petition, unless they involve the same facts.[5]

Moreover, a claim of ineffective assistance of appellate counsel does not relate back to a claim of ineffective assistance of trial counsel, or vice versa, since the claims pertain to different attorneys and different venues. *See, e.g., Ross v. Miller*, No. 14-CV-3098 (RA)(JLC), 2016 WL 1376611, at *27 (S.D.N.Y. Apr. 7, 2016) ("In his original petition, the only ineffective assistance of counsel claims Ross raised were those that related to his trial counsel, while his coram nobis application relates to the ineffective assistance of his appellate counsel. Specifically, Ross contends that his appellate counsel was ineffective for failing to raise arguments related to the ineffective assistance of trial counsel and failing to raise meritorious issues in a Section 440 motion. Therefore, because Ross's

---

[4]*See also, Herb v. Smith*, No. 14-CV-4405 (NGG), 2017 WL 1497936, at *4 (E.D.N.Y. Apr. 25, 2017)("An amendment to a habeas petition "does not relate back" if "it asserts a new ground for relief supported by facts that differ in both time and type from those [in] the original pleading." *Mayle v. Felix*, 545 U.S. 644, 650 (2005). It is not sufficient that the amendment generally refer back to the same trial, conviction or sentence. *Id*. at 656-57. Instead, the amended claim must arise out of "the same core facts alleged in the original petition." *Gibson v. Artus*, 407 F. App'x. 517, 519 (2d Cir. 2010) (summary order) (citing *Mayle*, 545 U.S. at 656-57))."

[5]*See, e.g., Beckford v. United States*, No. 13-CV-2208 (DLI), 2017 WL 4286615, at *6 (E.D.N.Y. Sept. 26, 2017) ("The original Petition timely asserted a claim for ineffective assistance of counsel for failure to file an allegedly requested appeal. . . . However, Petitioner's letter asserts new and factually distinct grounds for relief that differ in both time and type from his original petition that was filed more than two years earlier. . . . While the Petition is based on alleged conversations and conduct by Petitioner's counsel after his conviction, relating to a request for Petitioner's counsel to file an appeal, Petitioner's amendment relates to alleged conduct and conversations with Petitioner's counsel before Petitioner was convicted, regarding advice given to Petitioner about a guilty plea. Accordingly, the new claims rely on evidence independent from the factual bases for the ineffective assistance of counsel claims contained in the original petition, and, as the claims do not relate back, they are untimely.") (citations and internal quotation marks omitted).

17

newly-asserted ineffective assistance of counsel claims arise from a different proceeding, with a different lawyer, and are based on different grounds, they cannot relate back to his originally filed ineffective assistance of counsel claims.") (collecting cases); *see also, Corbin v. Perez*, No. 14CV3200 ER MHD, 2015 WL 3972252, at *6 (S.D.N.Y. June 26, 2015) ("Petitioner cannot escape a time bar on his proposed addition of a claim of ineffective assistance of appellate counsel because, under Rule 15(c) and *Mayle*, it does not relate back to his claim of ineffective assistance of trial counsel. The claim of ineffective appellate counsel concerns the performance of the appellate attorneys during petitioner's appeal from his conviction. Hence, it addresses events distinct in time and substance from the claim asserted in the original petition, which targeted the trial lawyer's conduct occurring during the trial.") (citations omitted).

As discussed earlier, Petitioner proposes to add three new claims of ineffective assistance of appellate counsel, as follows:

> [(1)] Appellate Counsel was ineffective for failing to brief on appeal that trial court's suppression ruling was erroneous for granting a *Huntley/Wade* hearing but ruling on *Mapp* and probable cause issues without granting a hearing on them which shifted the burden of proof[; (2)] for failing to raise stand-in-counsel's ineffectiveness for representing petitioner at a suppression hearing without becoming familiar with the case and failing to object to trial court's erroneous suppression ruling granting a *Huntley/Wade* hearing but ruling on *Mapp* and probable cause issues without granting a hearing on them which shifted the burden of proof, and  [(3)] for failing to raise the issue that petitioner was deprived of his constitutional right to be tried and convicted only on those crimes and theories charged in the indictment.

Motion to Amend [#20] at ¶ 24.

Petitioner contends that these claims relate back to the original petition, because they are based upon the same facts that were set forth in the original Petition [#1], in points I(2), I(9), II(2), II(3), II(5) and V. Petitioner did not use that roman numeral system to number the claims in his original Petition. Nevertheless, it appears clear to the Court that Petitioner's reference to points "I(2), I(9), II(2), II(3), II(5) and V" is intended to refer to points "22.A(2)" (ineffective assistance of trial counsel at suppression hearing, failure to move to suppress), "22.A(9)" (ineffective assistance of trial counsel at suppression hearing, failure to use impeachment material), "22.B(2)" (ineffective assistance of appellate counsel, for failing to argue that trial counsel was ineffective for failing to prevent the Court from allowing the prosecution to argue that Petitioner had not proven a renunciation defense), "22.B(3)" (ineffective assistance of appellate counsel, for failing to argue that trial counsel was ineffective for failing to object to the prosecution's request to argue that Petitioner had not proven a renunciation defense), "22.B(5)" (ineffective assistance of appellate counsel, for failing to argue that trial counsel was ineffective for failing to request that a jury charge be given concerning "immediate flight," with regard to the felony murder charge), and "22.E" (Petitioner's right to counsel was violated when he was interrogated after asking to contact the attorney who was representing him on an unrelated matter) in the original petition.

The three proposed-amended claims are factually distinct from, and do not relate back to, any of the aforementioned claims that were contained in the original petition. Indeed, the proposed amended claims do not relate back to any of the claims in the original petition. Consequently, the three proposed-amended claims of ineffective assistance of appellate counsel are time barred, and the motion to amend is denied.

Alternatively, even assuming that the proposed amended claims were timely, they lack merit for the same reasons that the other claims involving alleged ineffective assistance of appellate counsel lack merit, as discussed below.

<u>The Court Does Not Consider the Withdrawn Claims</u>

Before proceeding to consider the merits of Petitioner's claims in the original Petition [#1], the Court reiterates that Plaintiff voluntarily withdrew[6] the following claims: Point I(3) [22.A.(3)][7] (Petitioner was denied effective assistance of counsel for failing to request a preliminary *Ventimiglia* examination and for failing to object to testimony of prior bad acts); Point I(5) [22.A.(5)] (Ineffective assistance of counsel for failing to object to the prosecution's misleading summation, which suggested that Petitioner's DNA was on the live rounds of ammunition found at the crime scene); Point I(6) [22.A.(6)] (Ineffective assistance of counsel for failing to impeach the investigators at the suppression hearing and for failing to argue to the jury that the photo array/identification procedures were unreliable); Point VI [22.F] (Trial Court erred by permitting the prosecution to argue, in its summation, that Petitioner had not proven a renunciation defense); Point VII [22.G] (Trial Court erred by denying Petitioner's motion to suppress DNA evidence); and Point VIII [22.G] (Trial Court erred by denying motion to suppress identification).

With this clarification, the Court will proceed to consider the remaining claims in the Petition [#1]. Those claims can be divided up into the following categories: Ineffective assistance of trial counsel; ineffective assistance of appellate counsel; and errors

---

[6]*See*, Docket No. [#16] at pp. 1-2.

[7]Although the Court failed to mention this claim in its Order [#17], Petitioner clearly withdrew it. *See*, Docket No. [#16] at p. 1.

committed by the trial court.

<u>Ineffective Assistance of Trial Counsel</u>

Petitioner contends that he received ineffective assistance of trial counsel in various

ways. To establish ineffective assistance of counsel generally, a defendant

> must make two showings. First, he must demonstrate that his counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) [ ("*Strickland*") ]. Second, he must establish that he suffered prejudice—in this context, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S.Ct. 2052.

*Fulton v. Graham*, 802 F.3d 257, 265 (2d Cir. 2015). When applying the first *Strickland*

prong, courts must be

> mindful of the diversity of the bar and the variety of approaches effective attorneys might employ when dealing with a particular set of facts. To give appropriate deference to counsel's independent decisionmaking, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Another familiar risk is that, in the illuminating light of hindsight, we might look back and project ex post knowledge of consequences on the attorney's ex ante selection of one path among the many available to him. To counteract this inclination to evaluate counsel's performance against insight gained only through the passage of time, *Strickland* requires that "[w]hen assessing whether or not counsel's performance 'fell below an objective standard of reasonableness ... under prevailing professional norms,' " we must "consider the circumstances counsel faced at the time of the relevant conduct and ... evaluate the conduct from counsel's point of view." [*Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 688-89, 104 S.Ct. 2052) (first ellipsis in original).

*Parisi v. U.S.*, 529 F.3d 134, 141 (2d Cir. 2008).

As for the second prong of the *Strickland* test, to establish prejudice the Defendant is

> required to show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In evaluating prejudice, we look to the cumulative effect of all of counsel's unprofessional errors.

*Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005) (citations and internal quotation marks omitted). The strength of the government's case is relevant to whether the Defendant suffered prejudice. *See, id.* ("[W]here there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus.") (citation omitted); *Rosario v. Ercole*, 601 F.3d 118, 136 (2d Cir. 2010) ("*Strickland* makes clear that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' " 466 U.S. at 696,104 S.Ct. 2052.") (Straub, J., concurring in part and dissenting in part).

Here, Petitioner contends that trial counsel was ineffective in the following respects: 1) he failed to file a motion to dismiss the indictment after Petition was denied the right to testify before the grand jury; 2) he failed to move for suppression, based upon the fact that Petitioner requested an attorney while being questioned by Detectives Thomson and Coney; 3) he failed to preserve a legal sufficiency claim by failing to move for a trial order of dismissal as to all counts of the indictment; 4) he failed to argue that the identification procedures utilized by the police were defective; 5) he failed to impeach Detective Coney at trial with his grand jury testimony (Petitioner contends that there is an inconsistency

between the trial and grand jury testimony concerning whether Coney read Petitioner his *Miranda* rights from memory or read them from a card); 6) he failed to renew the motion for severance; and 7) he failed to object to two grossly unqualified jurors.

None of these contentions has merit. For example, counsel was not ineffective for moving to dismiss the indictment based upon a "denial" of Petitioner's right to testify before the Grand Jury, because Petitioner elected not to testify when he refused to sign the waiver of immunity.[8]

Petitioner's contention that trial counsel was ineffective for failing to move to suppress evidence also lacks merit. In that regard, Petitioner contends that counsel should have moved to suppress all evidence obtained in violation of right to counsel, since he was represented by an attorney in a different drug case.[9] Petitioner admits the other charge was unrelated, but now claims that he asked for an attorney during the questioning by Detectives Coney and Thomson.[10] However, the assertion that Petitioner asked for an attorney while he was being questioned by Thomson and Coney seems to be of very recent vintage. There is no indication that Osborne ever related this alleged incident to his

---

[8]*See, People v. Brumfield*, 109 A.D.3d 1105, 1106, 972 N.Y.S.2d 136, 138 (4the Dept. 2013) ("CPL 190.50(5) provides that, if a defendant serves upon the People a notice of his intent to testify before the grand jury, appears at the appropriate time and place, and signs and submits to the grand jury "a waiver of immunity pursuant to [CPL] 190.45," the defendant "must be permitted to testify before the grand jury" (CPL 190.50[5][b]; see CPL 190.50[5] [a] ). In the event that the defendant complies with those procedures and is thereafter not permitted to testify, the appropriate remedy is dismissal of the indictment (see CPL 190.50[5][c] )"), *aff'd*, 24 N.Y.3d 1126, 26 N.E.3d 1149 (2015)

[9]Osborne is incorrect insofar as he suggests that defense counsel did not move to suppress statements and evidence, including DNA evidence, since counsel did make such an application, in response to which the court conducted a suppression hearing, at which Osborne was present. *See*, Transcript of pre-trial hearing conducted on March 12, 2008.

[10]Habeas Petition [#1] at ¶ ¶ 22(A)(2) ("[D]uring interrogation appellant requested to contact his lawyer that was representing him on his pending drug case.") & 22(E) ("[D]uring interrogation he asked to contact his lawyer that was representing him on the unrelated pending drug case.").

trial attorney or to his appellate attorney. The claim was not raised in the appellate briefs prepared by counsel, nor did Osborne make this assertion in the *pro se* supplemental brief that he submitted in connection with his direct appeal. Nor was the claim made in Osborne's state collateral attack.[11] Moreover, in denying Osborne's collateral attack, the state trial court specifically noted that Osborne had not asked for an attorney.[12] This claim made years after the fact  -- that Osborne asked for an attorney during questioning -- is therefore simply not credible, and his argument concerning ineffective assistance of counsel in this regard is denied.

Petitioner's contention that counsel was ineffective for failing to preserve a sufficiency of evidence claim also lacks merit. Preliminarily, the Court notes that trial counsel did, in fact, move for a trial order of dismissal as to all counts of the indictment after the Prosecution rested, and he renewed that motion at the close of the defense's case. (T. 1331). However, to the extent that the motion was insufficiently specific to preserve the "sufficiency of the evidence" claim for appellate review, Petitioner was not prejudiced, because there clearly was sufficient, and indeed, overwhelming, evidence of his guilt.

---

[11]Osborne did not indicate that he asked for his attorney; rather, he argued that the detectives "were aware" that he had an attorney on the unrelated matter, and therefore should not have questioned him. *See*, Docket No. [#10-2] at p. 23.

[12]*See*, Docket No. [#10-2] at p. 53, Decision and Order denying motion to vacate, dated  June 28, 2011, at p. 2 ("According to hearing testimony, Mr. Osborne was cooperative and did not request that the questioning cease nor ask for an attorney to be present."); see also, *id*. at p. 165, Decision and Order denying suppression motion.

Additionally, the argument that counsel was ineffective for failing to object to grossly unqualified jurors also lacks merit, because the jurors were not grossly unqualified.[13]

Ineffective Assistance of Appellate Counsel

Petitioner also contends that he received ineffective assistance of appellate counsel. With regard to such a claim,

> it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made. However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

*Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994) (citation omitted).

Petitioner vaguely contends that appellate counsel's arguments on appeal were generally not "fully developed" or "supported by authority."  Further, he contends that appellate counsel should have argued that trial counsel was ineffective for failing to object to the prosecution's request for a jury instruction concerning the renunciation defense, for failing to object to the prosecution's summation, for failing to request a jury instruction

---

[13]On the first day of the trial, two jurors separately informed the Court that they thought they recognized a woman who was sitting in the audience in the courtroom. (T. 432-449).  The first juror indicated that the woman was a health-care aide who provided care to his aunt.  The juror stated that he had met the woman on more than one occasion, and that he thought the woman was the mother of the victim, Donny Paige. (T. 433).  The juror indicated that such fact would not affect him, but defense counsel objected to him remaining on the jury. (T. 436-437).  The second juror indicated that the woman was someone she had worked with, who she thought was the mother of prosecution witness Victor Bullard, who was in the middle of testifying at that point. (T. 440-441).  The juror indicated that she could be fair and impartial, and neither defense attorney objected to her remaining as a juror. (T. 442-443).  It was unclear whether the woman was actually Bullard's mother in any event. (T. 443).  It was then discovered that the first juror was incorrect, and that the woman to whom he was referring was not the mother of the victim, whereupon defense counsel withdrew their objections to the juror. (T. 450).

regarding felony murder,[14] and for failing to argue that there was legally insufficient evidence to convict him of second-degree criminal possession of a weapon.[15]  The Court notes, preliminarily, that trial counsel did, in fact, strenuously object to the prosecution's request for a jury instruction concerning the renunciation defense, and Petitioner's argument in that regard is therefore factually inaccurate.  Beyond that, Petitioner has not shown that the points appellate counsel raised were clearly and significantly weaker than the points that he claims should have been raised.  Consequently, the claims alleging ineffective assistance of appellate counsel are denied.

Rulings by the Trial Court

Petitioner alleges the trial court committed the following errors:  1) it did not dismiss the indictment, even though the prosecutor misstated the law to grand jurors; 2) it erred by denying Petitioner's suppression motion, since he requested an attorney during questioning by police; it didn't give attorneys and defendants notice of a jury note asking for exhibits (photo arrays) that were in evidence; and 4)  it imposed sentences that exceeded the maximum allowable, and which violated double jeopardy.  Even assuming *arguendo* that these claims are exhausted, they lack merit.

To begin with, even assuming that the prosecutor gave some erroneous instruction in the grand jury, such fact would not entitle Petitioner to habeas relief in this action.  *See, Mackey v. McGinnis*, No. 05 CIV. 4899 (DC), 2006 WL 2290829, at *13 (S.D.N.Y. Aug. 9, 2006) ("[E]rrors in state grand jury proceedings are questions of state law and therefore are

_____

[14]*See*, Petition [#1] at point 22.B.(5) ("The suspect alleged to be appellant fled  the scene before a weapon was pulled out and fired.  Trial counsel should have requested  that the elements of immediate flight be charged to the jury.").

[15]Petitioner contends that there was insufficient evidence that the firearm, which Bullard observed him holding, was loaded. See, Petition [#1], point 22.(b).(6).

not reviewable on a petition for a writ of habeas corpus.  In any event, any potential defect in a grand jury proceeding is cured by a subsequent conviction.") (citations omitted).

Further, Petitioner's argument that the trial court should have suppressed evidence lacks merit because, as already discussed, it is based upon his belated and completely unsubstantiated claim that he asked for an attorney while he was being questioned by police.

The claim that the trial court erred by failing to give proper notice that it had received a note from the jury, requesting exhibits (photo arrays) that were in evidence, also fails to provide a basis for habeas relief.  In the first place, the parties had agreed that the court could provide the jury with any requested exhibits, without reconvening the parties in the courtroom. (T. 1506-1507).[16]  Insofar as Petitioner is nevertheless alleging a violation of New York Criminal Procedure Law § 310.30, such a violation does not provide a basis to grant habeas relief. *See, Shuler v. Artus*, No. 9:15-CV-0399 (DNH), 2016 WL 698106, at *8 (N.D.N.Y. Feb. 19, 2016) ("There is no corollary requirement to CPL §§ 310.10 and 310.30 under federal law. Shuler's claim is therefore not cognizable on habeas review.") (collecting cases).  To the extent that Petitioner suggests that the trial court may not have given the jurors the exhibits that were requested, his claim is merely speculative, as there is no indication that the court failed to provide the jurors with the requested exhibits.

---

[16]*See, People v. Kirk*, 27 A.D.3d 383, 384, 812 N.Y.S.2d 492 (1st Dept. 2006) ("A note from the deliberating jury unambiguously requested nothing more than trial exhibits in evidence. Therefore, when the court ordered those exhibits delivered to the jury, in accordance with the parties' prior agreement (*see* CPL 310.20 [1]), it did not violate defendant's right to be present.") (citation omitted).

Finally, Petitioner contends that his sentences violate "double jeopardy," because when the terms of imprisonment that he received is added to the terms of supervised release that he received, the totals exceed the maximum terms of imprisonment allowed for each particular crime. However, this argument lacks merit. The facts of this case present no issue of double jeopardy, and the sentences imposed, as modified by the Appellate Division, Fourth Department, are in accordance with New York State law. *See, Johnson v. New York State Div. of Parole*, 83 A.D.3d 1168, 1169, 920 N.Y.S.2d 481, 482 (3d Dept. 2011) ("[A] determinate sentence is composed of two elements—a period of imprisonment and a period of postrelease supervision. Indeed, a court must impose "not only the term of imprisonment, but also an additional period of post-release supervision" (Penal Law § 70.45[1] ).").

Whether or not specifically discussed herein, the Court has considered all of Petitioner's claims, and finds that they also lack merit.

CONCLUSION

Osborne's applications to amend the petition [#20] and to expand the record [#29] are denied. Osborne's application under 28 U.S.C. § 2254 is also denied. The Clerk of the Court is directed to close this case. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Osborne has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with

Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated:          Rochester, New York
                April 17, 2018

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge